**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:19-cr-00095-4** |
| | ) | **Judge Aleta A. Trauger** |
| **MICHAEL KESTNER** | ) | |

## MEMORANDUM

Before the court are defendant Michael Kestner's Post-Trial Motion for Judgments of Acquittal (Doc. No. 452) and Motion for New Trial Under Rule 33 of the Federal Rules of Criminal Procedure (Doc. No. 453), to which the United States has filed a Consolidated Response (Doc. No. 461). Kestner filed a single document titled "Replies" in support of both motions (Doc. No. 462). For the reasons set forth herein, both motions will be denied.

## I. PROCEDURAL HISTORY

On October 9, 2019, defendant Michael Kestner and three co-defendants were charged in a Superseding Indictment with one count of conspiracy to commit healthcare fraud, in violation of 18 U.S.C. § 1349, and fifteen counts of knowingly and willfully executing and attempting to execute a scheme to defraud federal health insurance payors (primarily Medicare, but also TriCare and TennCare) (hereinafter, "government healthcare programs"), all government insurance programs affecting commerce, in violation of 18 U.S.C. §§ 1347(a) and 2. (Doc. No. 60.) The Superseding Indictment charged all four defendants in Count One; for each of Counts Two through Sixteen, it named Kestner and one of his co-defendants. The court granted in part a Motion to Dismiss filed by Kestner in August 2021, dismissing Counts Two, Seven, and Twelve as time-barred as to Kestner. (Doc. No. 208.) The court subsequently denied Kestner's first Motion to

Dismiss Superseding Indictment for Lack of Fair Notice, granted in part his Motion for Bill of Particulars, and denied Kestner's Renewed Motion to Dismiss. (Doc. Nos. 208, 219, 399.) Meanwhile, Kestner's co-defendants entered guilty pleas, each to a different specific Count in the Superseding Indictment. (Doc. Nos. 344, 348, 352.)

This case proceeded to trial on Counts One, Three through Six, Eight through Eleven, and Thirteen through Sixteen on October 15, 2024, against Kestner only. In support of the charges against Kestner, the government put on proof that Kestner, who is not a medical professional, was the majority owner and President of PainMD, which operated pain and wellness clinics in Middle Tennessee during the relevant time frame. The clinics were "mid-level driven," meaning that they were staffed and run by nurse practitioners and physician's assistants rather than doctors. The overwhelming majority of patients at the pain clinics had back pain. The government's claims against Kestner were premised upon Kestner's having built the clinics' business model upon the provision of tendon origin/insertion injections, or TOI injections, that Kestner was in charge of and micro-managed the clinics' operations, and that Kestner personally exerted tremendous and continuous pressure upon the mid-level providers to administer injections to patients, irrespective of medical need, resulting in practitioners' performing over 328,000 injections that were billed to the government healthcare programs as TOI injections from 2010 through May 28, 2018. The government sought to prove that the injections billed to government health programs as TOI injections were false and fraudulent—first, because they were not actually TOI injections, even though they were billed as such, and, second, because the purported TOI injections were not medically necessary. The government presented evidence that Kestner knew that the clinics were billing for medically unnecessary TOI injections but continued to pressure providers to administer more and more injections.

The government and the defendant both rested on October 22, 2024, and Kestner filed a written Motion for a Judgment of Acquittal (Doc. No. 420) the same day. After hearing oral argument, the court denied the motion in open court, addressing all three theories of relief raised by the defendant and concluding that there was sufficient evidence, viewed in the light most favorable to the prosecution, "that the essential elements of the crimes charged can be found by a jury beyond a reasonable doubt." (Trial Tr. Vol. 6, Doc. No. 445 at 139–40.) On October 24, 2024, the jury returned a verdict, finding Kestner guilty on all remaining counts in the Superseding Indictment. (Doc. No. 432.)

After seeking and being granted extensions of the deadline, Kestner filed the pending post-trial motions on December 11, 2024. As noted, the government opposes the motions.

## II.    MOTION FOR JUDGMENTS OF ACQUITTAL

### A.    Standard of Review – Rule 29

Motions for judgment of acquittal after the close of the government's case-in-chief, after the close of all of the evidence, and after the return of a verdict are all governed by Rule 29 of the Federal Rules of Criminal Procedure. Fed. R. Crim. P. 29(a), (c). The court must grant such a motion as to "any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). In determining whether such a motion should be granted, "[t]he relevant inquiry is whether, 'viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Fisher*, 648 F.3d 442, 450 (6th Cir. 2011) (emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

"Under the *Jackson v. Virginia* standard, a reviewing court does 'not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury,'" *id.* (citation omitted), and "it draws all reasonable inferences in the government's favor," *United*

*States v. Ostrander*, 411 F.3d 684, 691 (6th Cir. 2005). "'Substantial and competent circumstantial evidence by itself may support a verdict and need not remove every reasonable hypothesis except that of guilt.'" *Id.* (quoting *United States v. Lee*, 359 F.3d 412, 418 (6th Cir. 2004)). The defendant moving for a judgment of acquittal under Rule 29 bears a "very heavy burden." *Ostrander*, 411 F.3d at 691 (6th Cir. 2005) (citations omitted).

### B.      The Defendant's Arguments

The defendant asserts that he is entitled to judgments of acquittal on all counts in the Superseding Indictment on the grounds that: (1) the government failed to introduce sufficient evidence of the defendant's "elemental intent to defraud the subject insurance payors"; (2) the government's evidence of fraud is insufficient because it failed to produce an expert on CPT coding to testify that any statements made to government healthcare programs were in fact false and fraudulent; (3) the government "fatally failed to introduce proof of the allegedly 'false and fraudulent' claims that were allegedly submitted to the insurance payors (*i.e.*, the claims for reimbursement of Tendon Origin Insertion injections under CPT Code 20551 themselves)"; and (4) the evidence is insufficient to support the verdicts on the "substantive" counts in the Superseding Indictment, as distinct from the conspiracy count, because the government failed to prove that any other individual actually committed any of the underlying offenses, as required to establish Kestner's liability as an aider and abettor under 18 U.S.C. § 2 or under the *Pinkerton* theory of co-conspirator liability for substantive offenses committed in furtherance of a conspiracy. (Doc. No. 452 at 1–2.)

### C.      Discussion

#### *1.      Evidence of Intent to Defraud*

The defendant was convicted of healthcare fraud and conspiracy to commit healthcare fraud, under 18 U.S.C. §§ 1347 and 1349. To obtain the convictions under § 1347, the government

was required to prove beyond a reasonable doubt that Kestner "(1) knowingly devised a scheme or artifice to defraud a health care benefit program in connection with the delivery of or payment for health care benefits, items, or services; (2) executed or attempted to execute this scheme or artifice to defraud; and (3) acted with intent to defraud." *United States v. Martinez*, 588 F.3d 301, 315 (6th Cir. 2009). To prove a conspiracy to defraud, the government had show "(1) an agreement to accomplish an illegal objective against the United States; (2) one or more overt acts in furtherance of the illegal purpose; and (3) the intent to commit the substantive offense, *i.e.*, to defraud the United States." *United States v. White*, 492 F.3d 380, 395 (6th Cir. 2007) (citation omitted).

For both charges, that is, the government had to prove Kestner's specific intent to defraud a government healthcare program. But "[d]irect evidence of fraudulent intent is not required. [A] jury may consider circumstantial evidence and infer intent from evidence of efforts to conceal the unlawful activity, from misrepresentations, from proof of knowledge, and from profits." *United States v. Betro*, 115 F.4th 429, 443–44 (6th Cir. 2024) (internal quotation marks and citations omitted).

Here, Kestner acknowledges that the government offered expert medical testimony from Scott Kreiner, M.D., in the form of opinions that (1) the TOI injections at issue were not medically necessary and (2) they were not even properly billed under CPT Code 20551 because they were not actually TOI injections. (*See* Doc. No. 452 at 3.) Kestner also concedes that the government produced "ample evidence" that Kestner, as the pain clinics' co-owner and business manager, exerted pressure on mid-level providers to maximize revenues by performing TOI injections. (*Id.* at 4.) He contends, however, that the government failed to offer evidence that Kestner, who was not a medical professional, "had contemporaneous knowledge" that the TOI injections either were

not properly billed as TOI injections or were not medically necessary, "from which the jury could have reasonably inferred his intent to defraud" the government healthcare programs that were billed for the TOI injections. (*Id.* at 3.) He also argues that "'pressure,' even 'relentless pressure,' is not fraud" and that the government failed to present any other evidence establishing Kestner's knowledge that the TOI injections being billed to the government healthcare programs were not medically necessary or were not TOI injections. (*Id.* at 4–5.)

In response, the government argues that the defendant paints an incomplete picture of the proof, and it points to evidence in the record that, it contends, is collectively sufficient to establish Kestner's fraudulent intent. Specifically, the government points to testimony from former PainMD providers, including co-defendants, as well as emails and messages from Kestner to medical providers at the clinics showing that Kestner, a layperson, was inappropriately inserting himself into medical decisions and that the practitioners' responses were sufficient to alert him to the fact that he was pressuring them to perform procedures that were not medically necessary. The government points to training materials that were drafted or approved by Kestner, to the clinics' *quid pro quo* policy of requiring patients to accept injections in order to continue to receive opioid pain medication prescriptions, and to insurance companies' responses to PainMD's billing practices. The government asserts that this evidence, viewed collectively, "overwhelmingly established that [Kestner] had the requisite elemental intent to defraud." (Doc. No. 461 at 8.)

The court agrees that, while there was no smoking gun in this case, the evidence presented was more than sufficient to establish Kestner's fraudulent intent and his knowledge that the government healthcare programs were being billed for medically unnecessary procedures and, at least in some instances, inappropriately coded as TOI injections. And, while "pressure" on providers to increase their billing numbers might not be sufficient standing alone to establish

fraudulent intent in most cases, in this particular case, the pressure applied by Kestner was by all appearances so relentless and so inappropriate that it goes most of the way toward establishing fraudulent intent. In some of his messaging, Kestner indeed referenced "medical necessity." (*See, e.g.*, Gov't Ex. 824; *see also* Trial. Tr. Vol. 3, Doc. No. 442 at 92.) Any mention of medical necessity, however, was interpreted by providers—and apparently the jury as well—as mere "lip service," as it was entirely inconsistent with the rest of Kestner's messaging. Otherwise, Kestner's emails and in-person messages to providers were entirely targeted toward getting the providers to "control" their patients by informing them that they needed TOI injections, even going so far as instructing them to use the threat of discharging the patients from the clinic's care if they were unwilling to undergo at injections at every, or nearly every, clinic visit. To Kestner, increasing TOI injections was not a matter of medical necessity but, instead, a matter of "attitude and approach." (Doc. No. 442 at 92.) Through his constant email messages, in-person sessions with providers, sending other corporate employees to make in-person visits, publishing providers' rankings in terms of billing, and threatening them with termination if they did not meet his expectations, Kestner made it clear that he did not care about medical care, much less medical necessity, and that he acted with the intent to induce PainMD's providers to make sure that their patients accepted TOI injections, with knowledge that many—if not most—of these injections were not medically necessary.

One example illustrative of Kestner's tactics: after Kestner emailed co-defendant Dan Seeley, admonishing him for not administering enough injections and characterizing that failure as due to a "lack of will" on Seeley's part, Seeley explained to Kestner that he had tried injections and that they were not working. (*See* Gov't Exs. 162, 163.) Seeley testified that he explained as much to Kestner in person as well—namely, that he was not administering injections to a particular

patient because they were not effective and the treatment protocol for the patient's condition did not call for continuing to administer injections in that situation. (*See* Trial Tr. Vol. 4, Doc. No. 443 at 52.) Kestner responded, "but they haven't had your shots. And maybe your shots would work . . . and you should try giving them your shots." (*Id.*)

Another example: Shaun Kueter, an experienced nurse practitioner employed by PainMD from 2013 to 2015, testified that, in 2015, Kestner began rating and ranking employees based on "billings per provider." (Doc. No. 442 at 253.) He began circulating weekly emails notifying them of their ranking in comparison to other providers based on billing, sometimes followed up by personalized emails reminding them where they ranked. (*Id.* at 253–54, 260.) Shortly after he began doing this, Kestner met personally with Kueter in the summer of 2015 to discuss her "performance as a senior provider" and to pressure her to increase her billing, specifically by administering more TOI injections and trigger point injections. (*Id.* at 261.) He gave her a specific example, telling her that, out of her thirty to thirty-two patients per day, twenty of them should be receiving TOI injections or trigger point injections.[1] (*Id.* at 262.) Kueter was "personally affronted" by having a "lawyer," Kestner, "dictate clinical practice to [her]." (*Id.*) She believed it was not medically appropriate to administer injections to that number of patients, "because very few" of her patients on a daily basis had symptoms that called for injections. (*Id.*) And she told Kestner that administering so many injections would not be medically appropriate. (*Id.* at 263.) Kestner responded only by expressing disappointment in her "performance," stating that he expected more from her. (*Id.*)

---

[1] Testimony in the record established that TOI injections and trigger point injections were not the same, because trigger point injections involved injection of a corticosteroid and could only be given a few times per year. PainMD nonetheless categorized them together, but the primary emphasis was on TOI injections, because they were billed at a higher rate and because there was effectively no limit on how many times per year they could be administered.

Moreover, several days after that meeting, Kueter's nursing staff, at Kestner's instruction, began prefilling 20 lidocaine syringes for Kueter to use. (*Id.* at 265.) Kueter interpreted this as a message from Kestner that she needed to be administering the injections, regardless of whether she thought they were medically necessary. Kueter told her staff to stop prefilling syringes. Shortly after that, Kestner directed her to start faxing him a daily patient list, identifying what type of care each patient was receiving and whether and how many injections she administered for each patient. Kueter construed this directive as punishment for not increasing her billing of TOI injections. (*Id.* at 266.) Kueter left the practice shortly thereafter, because she believed it was "doing unethical billing with the trigger point and tendon origin injections." (*Id.*)

The government also points to the training materials that Kestner himself helped create—again, despite the fact that he was not a medical professional. These materials provided the responses that providers should give to patients who refused injections, including that providers should decline to issue prescriptions for opioid pain medication to patients who refused injections and instead refer those patients back to their primary care physicians. (*See* Gov't Ex. 417 at 3.) Virtually all of the providers who testified agreed that this strategy was intended to induce patients to accept the injections rather than risk not being able to timely refill their opioid medication prescriptions.

Doug Larner, a nurse practitioner who worked out of the corporate office as a trainer, further testified that Kestner's business model was to discourage "office visit only" patients—meaning patients who showed up only for a medication refill and did not receive a procedure of any kind—as not in "compl[iance] with the general protocol" and a "recipe for financial disaster." (Doc. No. 442 at 76.) In other words, the clinics' "protocol," per Kestner, was to ensure that the percentage of office-visit-only patients was "as low as possible." (*Id.*) Larner was directed by

Kestner to visit clinics and practitioners whose office visit percentage was too high to "solve" the problem by directing the practitioners to increase their billing. (*Id.* at 78–79.) The only way to "solve" this "problem," based on the evidence presented, was to administer TOI injections—whether they were medically necessary or not.

Jonathan White, a physician's assistant and originally a defendant in this lawsuit, also testified that, when he began working for PainMD, he was trained to perform TOI injections by Dr. Lisabeth Smolenski, PainMD's medical director, and Doug Larner. He was pressured by Kestner to perform injections "on as many patients as we could, every patient if we could and every visit if we could." (Trial Tr. Vol. 1, Doc. No. 440 at 51.) It is significant that, when White attempted to ascertain whether any medical literature or studies existed documenting the efficacy of TOI injections administered along the spine, as PainMD's providers were performing the procedure, he was unable to find anything. He also asked Dr. Smolenski about the basis for the procedure, and she was unable to find any substantiating studies. TOI injections in the spine, as opposed to a joint, were not something White had learned in school or had ever performed prior to going to work at PainMD, and they were never discussed at any pain medicine conferences he attended. (*Id.* at 58–61, 80, 86–88.) He eventually discovered that the protocol for performing TOI injections used at PainMD was derived from a single letter from Arthur F. Dalley, Ph.D., a professor at the Vanderbilt School of Medicine (but not a medical doctor himself), to John Faccia, M.D. at Spectrum Pain Clinic—PainMD's predecessor, operated by Dr. Faccia and Michael Kestner. (*See* Gov't Ex. 287.) This 2004 letter states in full:

> This letter is written to state that cadaveric investigation indicates that injection into the thoracic region of the back, within 1 finger's breadth of the spinous processes of the middle and lower thoracic vertebrae, and into the lumbar region of the back, within two finger's breadths of the spinous processes of the lumber vertebrae, using a 1 1/4" hypodermic needle, should enter the region of the origin and insertion of

the spinalis thoracis (in the thoracic regio) and transversospinalis muscles. Obesity
may require a longer needle length, particularly in the lumbar region.

(*Id.*) According to White, this was the precise procedure he was taught to perform, except that they always used 1-1/4" needles, irrespective of whether the patient was obese, and he was taught that the needle "would" enter "the region of the origin and insertion," rather than that it "should." (Doc. No. 440 at 93–94.)

Aside from pressuring providers to administer injections in order to increase their billing, and despite being told repeatedly that more injections would be medically unnecessary, Kestner also was aware that the clinics had received "hundreds" of pre-payment and post-payment review letters from insurance companies, including Medicare contractors, that specifically challenged PainMD's provision of TOI injections and, in some cases, the coding of the injections as TOIs. (*See* Gov't Exs.101A, 111A; Doc. No. 442 at 167–74.) Kestner kept pushing TOI injections anyway.

This is just some of the circumstantial evidence in the record. The court finds that the evidence introduced at trial showing that Kestner was aware that providers were administering medically unnecessary TOIs, that he continued to exert significant pressure on PainMD providers to increase the rates at which they administered TOI injections to patients, that he ranked the providers according to billing and then shamed and called out those who were not in the top tier of billers, that he provided financial incentives for increased billing of TOI injections, and that he threatened the jobs of those providers who were not, in his view, performing adequately, along with other evidence in the record, was more than sufficient to permit a reasonable jury to infer that Kestner had the requisite intent to defraud the government.

Kestner's argument that the government improperly seeks to rely upon "inference upon inference" in order to prove intent confuses inference with circumstantial evidence. The evidence

presented at trial established that Kestner was driven solely by a desire to increase his profits and that he had actual knowledge that he was pushing medical providers to perform medically unnecessary TOI injections and knowledge that PainMD was billing the government healthcare programs for those medically unnecessary TOI injections. The sheer number of TOI injections the PainMD clinics administered during the relevant time frame further substantiates that conclusion.

2.       *The Government's Failure to Produce a CPT Coding Expert*

Kestner next argues that the evidence against him was *per se* insufficient because no CPT coding expert testified that PainMD's use of 20551 to bill TOI injections was improper. (Doc. No. 452 at 13.) According to Kestner, without such evidence, the jury had no reasonable basis for "concluding that the service described as a TOI injection (CPT Code 20551) constituted the execution of a scheme to defraud or an agreement to defraud Medicare." (*Id.*) Kestner characterizes the government's theory as premised upon "upcoding," that is, billing for injections coded as TOI injections under 20551 when they should have been coded as something else that entailed a lower rate of reimbursement. (*Id.* at 14.)

Kestner is grasping at straws here. The evidence presented at trial established that Kestner's clinics repeatedly billed procedures under the code number 20551, the CPT code associated with a "single tendon origin/insertion" injection. (*See* Gov't Ex. 423.) And the government's expert, Dr. Kreiner, testified that the injections performed on the patients whose medical records he reviewed (those associated with the substantive fraud charges) were both medically unnecessary and were not actually TOI injections. (*See generally* Trial Tr. Vol. 5, Doc. No. 444 at 155–211.) The government's theory was not premised upon upcoding, *per se*, and no coding expert was required to establish that the TOI injections were improperly billed.

### 3. Evidence of False Claims for Payment Submitted to Insurance Payors

With respect to the substantive Counts of the Superseding Indictment, Kestner renews his argument that "the government failed to prove the existence of the 'false and fraudulent claims' that the substantive Counts were based upon and allegedly arose from." (Doc. No. 462 at 15.) Kestner argues in particular that the jury had no opportunity to compare the chart set out under paragraph 24 of the Superseding Indictment "against the actual 'claims' that the chart purported to describe," because the government "*did not offer the presumably pre-existing evidence that the chart purported to summarize*," as a result of which "the jury was effectively left to take it on faith that the chart was accurate." (*Id.* at 16 (emphasis in original).)

Kestner's position is that the Superseding Indictment itself was effectively the government's only "evidence" of the false claims, but an indictment does not qualify as evidence. He acknowledges that the government did introduce into evidence the charts labeled Government Exhibits 300 through 302, but he claims that these just "repeated . . . the chart in paragraph 24" of the Superseding Indictment. (*Id.*) They did not, according to Kestner, include the claims themselves, and the "sources" cited in footnote 1 of each chart, referencing Government Exhibits 1000–13, "were just spreadsheets, not the claim submissions themselves (or printouts of the claims)." (*Id.* at 16–17.)

More specifically, Kestner takes issue with the government's failure to introduce the actual electronic Forms 837P, which were the forms PainMD would have used to electronically submit the claims for payment. Kestner states that, although the Forms 837P were not alleged in the Superseding Indictment or introduced into evidence, "we know" they exist, because they were alleged in the civil complaint against Kestner and others, filed in 2018 by the government in *United States v Kestner*, No. 3:18-cv-01289 (M.D. Tenn. Nov. 15, 2018), ECF No. 1. Kestner argues that the Forms 837P were necessary to "supply the ultimate, historical source of the data from which

the government constructed the various summary charts that it introduced under Rule 1006, Fed. R. Evid. (over Defendant's objections)."

To prove the substantive claims, the government had the burden of proving that Kestner in fact submitted, or caused to be submitted, "fraudulent claims to Medicare for reimbursement, a necessary element of his substantive health care fraud conviction." *United States v. Jankowski*, No. 23-1404, 2024 WL 4554690, at *2 (6th Cir. Oct. 23, 2024) (citing *United States v. Hunt*, 521 F.3d 636, 645 (6th Cir. 2008)). To satisfy that burden in this case, the government introduced the testimony of a former billing manager for PainMD, who testified that Medicare claims were submitted electronically. (Doc. No. 442 at 135–36.) The government made available to the defendant the underlying billing data (Gov't Exs. 1000–03, 1011–13), and it introduced into evidence the Rule 1006 summaries of the billing data as to each count (Gov't Exs. 300–03), along with the testimony of a program witness for the Medicare data, Stephen Quindoza, who testified that he reviewed the Medicare billing data and that it comported with the claims submitted. (*See* Trial Tr. Vol. 2, Doc. No. 441 at 103–04.) The government also introduced an independent auditor, Mike Petron, who described how he reviewed the billing data in order to create the summary exhibits that explained each substantive count in the indictment. (*See* Doc. No. 444 at 296–302.) The parties also argued about this issue during trial, when the defendant objected to the admissibility of the summary charts in Government Exhibits 300–03. The government explained then that "producing" the underlying claims was not as easy as the defendant suggested, because the data in native format would be voluminous and "incredibly confusing" for the jury. (*See* Doc. No. 445 at 114.)

The court finds that the government was not required to introduce the Forms 837P into evidence, that it made the underlying billing data available to the defendant, and that the

government witnesses connected the specific fraud charges to the claims submitted. The evidence presented by the government was more than sufficient to permit the jury to conclude, beyond a reasonable doubt, that PainMD submitted the claims that were the subject of the substantive claims in the Superseding Indictment to Medicare for reimbursement.

### 4. Proof that Co-Defendants Committed Substantive Offenses

Kestner argues that he cannot be liable for aiding and abetting or under a *Pinkerton* theory for any of the substantive Counts, because the government failed to prove that the co-defendants actually committed the substantive offenses charged in the Superseding Indictment. (Doc. No, 452 at 21–22.) He notes that co-defendant Brian Richey pleaded guilty only to Count Five; co-defendant Dan Seeley pleaded guilty to Count Eight; and co-defendant Jonathan White pleaded guilty to Count Twelve—a count dismissed as time-barred as to Kestner. None of these defendants unambiguously conceded at trial that they were guilty of any of the charges against them, and they were never asked specifically about the conduct that led to the charges to which they did plead guilty. Kestner argues that he was not personally involved in administering injections and that he cannot be guilty of "aiding and abetting" unless the government proves, among other things, that *someone* actually committed the subject offenses. He contends that in this case, the government failed to prove that anyone committed the underlying offenses. (*Id.* at 23–25.)

In response, the government argues that it put forth ample evidence that all of the substantive Counts related to injections that were not medically necessary and evidence that the co-defendant providers responsible for the injections knew they were administering medically unnecessary injections, irrespective of whether they unambiguously confessed in open court. (Doc. No. 461 at 13.)

As the government points out, under an aiding and abetting theory of liability, it is the defendant's intent, not that of his co-defendants, that determines whether the underlying offense

was committed. *See United States v. Daniels*, 653 F.3d 399, 408 n.3 (6th Cir. 2011) ("An individual may be convicted as a principal responsible for a crime if the person willfully caused the crime to be committed.").[2]

*Pinkerton* liability, derived from *Pinkerton v. United States*, 328 U.S. 640 (1946), is a type of "vicarious liability that allows members of a conspiracy to be held liable for reasonably foreseeable substantive offenses committed by coconspirators in furtherance of the conspiracy." *United States v. Woods*, 14 F.4th 544, 552 (6th Cir. 2021). Under this doctrine, "a member of a conspiracy is liable for substantive offense[s] committed by his coconspirators, even if he did not participate in them, as long as: (1) the offenses are done in furtherance of the conspiracy, (2) they fall within the scope of the unlawful project, and (3) they are reasonably foreseeable consequence[s] of the unlawful agreement." *Id.* (quoting *United States v. Hamm*, 952 F.3d 728, 744 (6th Cir. 2020) (alterations in original). For this type of liability, the mental state of the co-conspirators is clearly relevant, as the jury first must first find that a conspiracy existed before it can find the defendant guilty of the substantive offenses.

In this case, by returning a guilty verdict on the conspiracy charge, the jury clearly found that such a criminal agreement existed and that the co-defendant providers conspired with Kestner to commit health care fraud in the substantive counts charged in the Superseding Indictment. The evidence was sufficient to support those conclusions. The government's medical expert, Dr. Kreiner, testified that each individual injection that represented a substantive count was not

---

[2] The government provides an example of an individual "who takes a television off the shelf at an electronics store and hands it to a friend, telling the friend to carry it out of the store to a waiting vehicle because it had been paid for." (Doc. No. 461 at 13.) Even if the friend has no knowledge that a theft is being committed, the "individual who took the television, handed it to the friend, lied to the friend, and caused the friend to carry out the crime is responsible as an aider and abettor" for the theft of the television, under the law. (*Id.*)

medically necessary. (*See* Doc. No. 444 at 133–211.) And, as discussed above, the government offered ample proof that Kestner exerted pressure on the providers to generate revenue for PainMD through TOI injections, with the intention that they administer injections that were not medically necessary. Further, the evidence showed that Kestner's pressure campaign caused the providers to perform injections that were medically unnecessary.

For example, Jonathan White, who pleaded guilty to Count Twelve (the count dismissed as time-barred as to Kestner), testified that Kestner's emails ranking providers by the number of injections they administered were "particularly anxiety-inducing" and made it appear to his colleagues as if he was "not doing enough." (Doc. No. 443 at 147.) Asked whether such emails motivated him to perform injections that might not have been medically necessary, White responded, "Yes." (*Id.*) Similarly, Dan Seeley, who pleaded guilty to Count Eight, testified that Kestner required him to produce reports explaining why any patient did not receive an injection. (Doc. No. 443 at 38–47.) Seeley testified that this practice, coupled with the other pressure Kestner applied, "had an effect on [him]." (*Id.* at 53.) Seeley continued, "It wore me down to where I realized – somewhere along the way I realized that I had been giving more shots than were absolutely necessary. I was doing more than was needed." (*Id.* at 53–54.) On cross-examination, he conceded that, toward the end, there were "red flags that [he] ignored." (*Id.* at 72.)

Co-defendant Brian Richey, who pleaded guilty to Count Five, described feeling "embarrass[ed]" when he was not among the top names in Kestner's emails ranking providers in productivity and that this drove him to administer injections that he knew were not medically necessary. (Doc. No. 444 at 58.) He stated in a private text message to Amanda Fryer on May 1, 2017, that he had a hand injury due to performing excessive numbers of injections and that he was "injecting people [who] didn[']t want it but took it to stay a patient." (*See id.* at 72; Gov't Ex. 209.)

He explained at trial that these patients received injections "[t]o keep their opioids," and he admitted that that was one reason the injections were not medically necessary. (Doc. No. 444 at 111.) Joel Hart, another PainMD provider, testified that, in 2015, he heard Richey explain to colleagues "how to increase tendon origin injections, how to chart that tendon origin injections were necessary, how many times to attempt to give patients tendon origin injections before saying that they were not useful for them, [and] how to talk to patients to try to get them to agree." (Doc. No. 445 at 60.) Hart described Richey's tactics as "unethical" and "immoral." (*Id.* at 60.)

The jury was instructed that it could find Kestner guilty on the substantive claims either through aiding and abetting or through *Pinkerton* liability. (*See* Doc. No. 428 at 25–27.) Based on the evidence referenced above as well as other evidence in the record, the jury had sufficient evidence before it to reasonably conclude that the testifying co-defendants underplayed and minimized their understanding at the time that what they were doing was medically unnecessary and that they were knowingly complicit with Kestner in an illegal scheme and implicit agreement to bill the government healthcare programs for medically unnecessary TOI injections. That is, although they pleaded guilty only to one substantive offense each, the evidence was sufficient to demonstrate to the jury that the co-defendant providers had the requisite mental state and did commit all of the substantive offenses of health care fraud as charged in the Superseding Indictment, which allowed the jury to find Kestner guilty of those same offenses through either aiding and abetting or *Pinkerton* liability, or both.

### D. Conclusion

Viewing the totality of the evidence in the light most favorable to the government, the court finds that the defendant is not entitled to a judgment of acquittal. His Rule 29 motion, therefore, will be denied.

### III.    MOTION FOR NEW TRIAL

#### A.    Standard of Review – Rule 33

Under Rule 33, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Motions under Rule 33 are "disfavored, discretionary, and granted only in the extraordinary circumstance where the evidence preponderates heavily against the verdict." *United States v. Bowens*, 938 F.3d 790, 796 (6th Cir. 2019) (quoting *United States v. Mitchell*, 9 F. App'x 485, 489 n.2 (6th Cir. 2001)). "Such a motion calls on the trial judge to take on the role of a thirteenth juror, weighing evidence and making credibility determinations firsthand to ensure there is not a miscarriage of justice." *United States v. Mallory*, 902 F.3d 584, 596 (6th Cir. 2018) (citation omitted). "A trial court should only grant the motion when the verdict is against the 'manifest weight' of the evidence." *Bowens*, 938 F.3d at 796 (citing *Mallory*, 902 F.3d at 596).

#### B.    Kestner's Arguments

In support of his Motion for a New Trial, Kestner argues that: (1) the admission of the summary charts collectively introduced as Government Exhibit 354, under Federal Rule of Evidence 1006, to which the defendant also refers as the "outlier charts," violated Kestner's right to confront and cross-examine witnesses and violated Rules 1006 and 802 of the Federal Rules of Evidence; (2) the "deliberate ignorance" jury instruction lacked a sufficient evidentiary basis and was unfairly misleading and prejudicial; (3) the court should have granted the defendant's repeated motions for a mistrial based on the purported error in admitting BlueCross BlueShield of Tennessee's civil Complaint (Gov't Ex. 800) into evidence; (4) the court should find that the cumulative effect of all of these errors entitles him to a new trial; and (5) the court should exercise its role as the "thirteenth juror" and find that the jury's verdict was against the manifest weight of the evidence.

### C.       Discussion

#### 1.       *Government Exhibit 354*

The court ruled on the defendant's Motion in Limine (Doc. No. 365), which sought to exclude from evidence the summary charts (Gov't Exs. 303–30 and 352–59) and the underlying data sets from which the summary charts were derived (Gov't Exs. 1000–24), at the October 3, 2024 pretrial conference. Although neither party has requested a copy of the court reporter's transcript, the court's own memory and notes from the pretrial conference confirm that the court denied the motion in its entirety, ruling that the Medicare spreadsheet data as a whole was not testimonial and was not prepared in anticipation of trial. The court further found that the Medicare (and other providers') spreadsheets qualified as records of regularly conducted business activity under Federal Rule of Evidence 803(6) and, as such, were presumptively admissible into evidence. This ruling pertained to all of the 1000-series exhibits. The court further found that the summaries, assuming that the underlying data had been produced to the defendant, were appropriate and admissible. Kestner renewed his objection to these documents, including Government Exhibit 354, at trial, just before the introduction of these exhibits into evidence through the government's witness, Stephen Quindoza. (*See* Doc. No. 441 at 95–96.)

The defendant's Rule 33 motion now offers nothing new in regard to this issue. For a summary of evidence to be admissible under Rule 1006,

> (1) the underlying documents must be so voluminous that they cannot be conveniently examined in court, (2) the proponent of the summary must have made the documents available for examination or copying at a reasonable time and place, (3) the underlying documents must be admissible in evidence, (4) the summary must be accurate and nonprejudicial, and (5) the summary must be properly introduced through the testimony of a witness who supervised its preparation.

*United States v. Jamieson*, 427 F.3d 394, 409 (6th Cir. 2005) (citing *United States v. Modena*, 302 F.3d 626, 633 (6th Cir. 2002). The only one of these criteria Kestner appears to be challenging is

the third—whether the underlying documents were admissible into evidence. Notably, Rule 1006 does not require that the underlying documents be *admitted* into evidence, only that they be *admissible*. Regarding this criterion, the Sixth Circuit has "held that all documents underlying a Rule 1006 summary must be admissible into evidence, but [it has] placed no further restrictions on the admissibility of the underlying documents." *Id.* at 410.

As set forth above, the court ruled at the pretrial conference that the Medicare records contained in the 1000-series of proffered exhibits qualified as business records under Rule 803(6) and, as such, were "not excluded by the rule against hearsay." Fed. R. Evid. 803. Moreover, because the records were not testimonial, they were admissible without regard to the defendant's rights under the Confrontation Clause. *Accord United States v. Smith-Kilpatrick*, 942 F.3d 734, 740 (6th Cir. 2019) (holding that business records generally are "not testimonial and thus do not implicate the Confrontation Clause"). While the Sixth Circuit has also recognized that Rule 1006 summaries can "theoretically be the subject of a Confrontation Clause challenge in a case where the individual who prepared the chart was not available for cross-examination," *id.* (quoting *United States v. Williams*, 662 F. App'x 366, 376 n.6 (6th Cir. 2016)), Stephen Quindoza, the person who prepared the charts that make up Government Exhibit 354, testified at trial and was cross-examined. Thus, as in *Smith-Kilpatrick*, "even if the summaries qualified as testimonial, the court did not violate the Confrontation Clause by admitting them." *Id.* Kestner could have, but chose not to, question Quindoza further about the preparation of the charts or how the underlying information was retrieved from the Medicare database, and he does not argue that the summaries are inaccurate. Moreover, because Government Exhibit 1024 was not entered into evidence at the trial, the government had no need to provide a Rule 902(11) certification for it. The court rejects the

defendant's argument that the government was required to proffer Government Exhibit 1024 at trial in order to establish its admissibility.

In sum, the government established that the 1000-series exhibits, including Government Exhibit 1024, were not hearsay, were not testimonial, and were admissible as records of regularly conducted business activity. Consequently, Government Exhibit 354 was properly admitted into evidence as a Rule 1006 summary. Kestner's continued objections are without merit.

### 2. *"Deliberate Ignorance" Jury Instruction*

The court instructed the jury as follows regarding "deliberate ignorance":

> No one can avoid responsibility for a crime by deliberately ignoring the obvious. If you are convinced that the defendant deliberately ignored a high probability that injections administered by Pain MD providers were medically unnecessary, or that injections administered by Pain MD providers were notated as "Tendon Origin Injections" when in fact they were not, then you may find that the claims for reimbursement that resulted from those injections were fraudulent. But to find this, you must be convinced beyond a reasonable doubt that the defendant was aware of a high probability that injections administered by Pain MD providers were medically unnecessary, or that injections administered by Pain MD providers were notated as "Tendon Origin Injections" when in fact they were not, and that the defendant deliberately closed his eyes to what was obvious. Carelessness, or negligence, or foolishness on his part is not the same as knowledge, and is not enough to convict. This of course, is all for you to decide.

(Doc. No. 442 at 171–72; *see also* Doc. No. 428 at 20.)

The defendant specifically objected to this instruction during trial on the basis that there was no evidence in the record that Kestner "failed to ask doctors whether TOIs were medically necessary," that he "failed to ask whether medical protocols were implemented by the doctors and whether they were correct," or that he did anything else that would "show that he was putting his head in the sand and trying to avoid knowledge." (Doc. No. 445 at 143–44.) He argued more generally that the instruction had the effect of "lessening the burden of proof" and was "confusing," insofar as the jury might equate deliberate ignorance with negligence. (*Id.* at 144.)

Kestner renews his objection to the instruction, but he references only in passing the "lack of an evidentiary basis" and the other arguments he raised at trial. (*See* Doc. No. 453 at 9, 10.) Now, his objection to the instruction is focused on the fact that, although the instruction as given closely mirrors Sixth Circuit Pattern Criminal Jury Instruction No. 2.09, it deviated from the pattern instruction by omitting the words "he knew," highlighted as follows in the pattern instruction:

(1) Next, I want to explain something about proving a defendant's knowledge.

(2) No one can avoid responsibility for a crime by deliberately ignoring the obvious. If you are convinced that the defendant deliberately ignored a high probability that _____, then you may find that *he knew* _____.

(3) But to find this, you must be convinced beyond a reasonable doubt that the defendant was aware of a high probability that _____, and that the defendant deliberately closed his eyes to what was obvious. Carelessness, or negligence, or foolishness on his part is not the same as knowledge, and is not enough to convict. This, of course, is all for you to decide.

Sixth Circuit Pattern Crim. Jury Instr. 2.09 (emphasis added.) Kestner argues that the pattern instruction "allows a jury to infer a defendant's *knowledge* of certain relevant facts from evidence that he *deliberately ignored* a high probability that those facts existed" but that the instruction as actually given in this case "allowed the jury to conclusively find the presence of criminal fraud from Defendant's alleged deliberate ignorance, which was a bridge too far," because it omitted the words "he knew." (Doc. No. 453 at 10.) He also maintains that the instruction as worded was prejudicially unfair, because it "amounted to an effective theory of the case instruction for the government," to which the government was not entitled, and that this "error" was compounded by the fact that the jury also received a copy of the Superseding Indictment. (*Id.* at 11.)

It seems likely that the omission of the words "he knew" from the instruction as given in this case was a typographical error that neither the parties nor the court noticed when drafting the instruction based on the Sixth Circuit Pattern Instruction. While the omission is unfortunate, the

defendant did not raise this specific objection at trial. Consequently, the court considers this issue under a "plain error" standard of review. *See* Fed. R. Crim. P. 30(d) ("A party who objects to any portion of the instructions . . . must inform the court of the *specific objection and the grounds for the objection* before the jury retires to deliberate." (emphasis added)); Fed. R. Crim. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention.").

"In the context of challenges to jury instructions, plain error requires a finding that, taken as a whole, the jury instructions were so clearly erroneous as to likely produce a grave miscarriage of justice." *United States v. Morrison*, 594 F.3d 543, 546 (6th Cir. 2010) (quoting *United States v. Newsom*, 452 F.3d 593, 605 (6th Cir. 2006)). The defendant here insists that plain error occurred. (Doc. No. 435 at 12.) The court finds that the error did not affect the defendant's "substantial rights."

The jury instructions, viewed as a whole, made it clear that, to find Kestner guilty of conspiring to commit health care fraud, the jury had to find beyond a reasonable doubt that he "knowingly and voluntarily joined" in a conspiracy to commit the crime of healthcare fraud. (*See* Doc. No. 428 at 18.) To find him guilty of the substantive offenses, the jury had to find that Kestner had the "intent to defraud," which was defined to mean "an intent to deceive or cheat for the purpose of either causing a financial loss to another or bringing about a financial gain to oneself or to another person." (*Id.* at 23. 24.) The jury also received instructions on the defendant's good faith defense and his "Theory of the Defense." (*Id.* at 28, 30.) Irrespective of whether the deliberate indifference instruction as given embodied part of the government's theory, the fact that it appeared just before Kestner's "Theory of the Defense" instruction did not make it somehow more prejudicial or erroneous. (*Id.* at 30.)

The court finds that the instructions as a whole clearly conveyed to the jury the elements of the offense(s) that they were required to find beyond a reasonable doubt in order to convict Kestner. The omission of the words "he knew" from the "deliberate ignorance" instruction does not amount to plain error infecting the fairness of the trial or the defendant's fundamental rights. Moreover, the instruction fairly followed the Sixth Circuit Pattern Instruction and did not simply summarize the government's theory of the case. Finally, the instruction, in context, was not confusing, and the court stands by its ruling during trial that the instruction did not somehow lessen the government's burden of proof.

### 3. *BlueCross BlueShield Civil Complaint*

The defendant filed a pretrial Motion in Limine (Doc. No. 366) to exclude, among other things, the civil Complaint ("civil Complaint") (Gov't Ex. 800) filed by BlueCross BlueShield of Tennessee ("BCBST") against Kestner and others in the Hamilton County Circuit Court in October 2014, on the basis that it was hearsay. (*See* Doc. No. 366 at 3–4.) Kestner also posited that, if the civil Complaint came into evidence, then the defense should be permitted to enter into evidence the September 1, 2015 Settlement Agreement "in the interest of completeness." (*Id.* at 4.) The government argued in response that it intended to use the civil Complaint (and other documents) to demonstrate that Kestner "was on notice . . . that his conduct was illegal and inappropriate." (Doc. No. 381 at 14.) It did not object to the introduction of the Settlement Agreement. (*Id.* at 15 n.11.) At the pretrial conference, the court denied the motion seeking exclusion of the civil Complaint, given the government's argument that it was being introduced for the purpose of notice and not for the truth of the matter asserted in the document and its stipulation that it did not object to the introduction of the Settlement Agreement by Kestner.

At trial, prior to the introduction of the civil Complaint, the defendant renewed his objection, but the court did not reverse its prior ruling. (*See* Doc. No. 442 at 6.) The government

was permitted to call a BCBST employee to discuss the civil Complaint at trial and to show parts of it to the jury during that testimony. During that testimony, the defendant sought a limiting instruction, which the court granted, specifically telling the jury that the civil Complaint was "not being offered for the truth of what it asserts" but, instead, to show that Kestner "had notice that BlueCross considered some of the TOI billings improper in some way." (*Id.* at 26–27.) The defendant objected again during the testimony, and the court overruled the objection, notifying the government that it would not be permitted to "go through every bit of this complaint" but that it was "appropriate" for the government "to bring out exactly what [Kestner] had notice of." (*Id.* at 32.) The court reiterated the instruction to the jury that the civil lawsuit was not being admitted for the truth of the matters asserted in the complaint (*id.* at 35), and the BCBST witness was repeatedly asked during direct examination whether the allegations "gave notice to Kestner" or "notified" him that BCBST was critical of his clinics' practices with regard to TOI injections (*see id.* at 35, 36).

Following the BCBST witness's direct testimony, defense counsel moved for a mistrial, which the court denied. (*Id.* at 45.) Following the defendant's cross-examination of the witness, the court stated on the record outside the presence of the jury that, because the Settlement Agreement was entered into evidence upon the defendant's request, the defendant had the opportunity to immediately lessen the impact of the civil Complaint by having the witness testify that the Settlement Agreement included a "no-admission-of-liability paragraph" but that, inexplicably, the defense had not done so. (*Id.* at 81.)

Later the same day of trial, the jury submitted a note to the court, requesting clarification as to how they were permitted to use the civil Complaint. The court answered the question in open court, instructing the jury that the exhibit

is not being offered for the truth of the allegations of the complaint. It is being offered for notification to Mr. Kestner that BlueCross had these problems with their practice that they were raising with them.

But I will give you an instruction at the end that says: When we have admitted an instruction [sic] for a limited purpose, it's for that purpose only and it's not to be used for any other purpose. And I've told you two or three times, that complaint is not being offered for the truth of the allegations made by BlueCross.

(*Id.* at 217–18.) Following this instruction, the defendant renewed his motion for a mistrial on the basis that the civil Complaint was confusing, that the jury would attach too much significance to it, and that it was unfairly prejudicial, insofar as it was "the absolute mirror image of the allegations" in this case. (*Id.* at 219.) The court again denied the motion. (*Id.*) The defendant also filed a written Renewed Motion for a Mistrial based on the introduction of Government Exhibit 800. (Doc. No. 419.) The court orally denied that motion as well. (*See* Doc. No. 444 at 250–51.)

Following the close of proof, the defendant argued that, despite having been introduced into evidence, neither the civil Complaint nor the Settlement Agreement should go back to the jury. (Doc. No. 445 at 150–51.) After again reviewing the civil Complaint, the court agreed that it should not go back to the jury during deliberations and that the government would not be permitted to display it during its closing argument, because the probative value of *the document itself* was substantially outweighed by the danger of unfair prejudice. (Doc. No 446 at 5–6.) After discussion with the parties, the court instructed the jury as follows:

You heard testimony about a civil lawsuit that Blue Cross/Blue Shield filed against Mr. Kestner and others in state court some years ago. That testimony was not offered for the truth of what Blue Cross/Blue Shield alleged in the lawsuit but as evidence that Mr. Kestner had notice through this lawsuit that Blue Cross/Blue Shield thought that the billings submitted to it for TOIs were improper. You will not have the Blue Cross/Blue Shield complaint, Exhibit 800, to review along with the other exhibits.

(*Id.* at 155.)

The defendant now argues in his Motion for a New Trial that the government's "misuse" of the civil Complaint during trial warrants a new trial and that the court erred in admitting the civil Complaint into evidence in the first place. (Doc. No. 453 at 12.) The defendant "freely acknowledges" that the court "properly took extensive measures to cure the government's misuse of [Government Exhibit] 800," but he contends that those instructions were not sufficient to mitigate the "original error . . . in admitting [the civil Complaint] into evidence to begin with." (*Id.* at 17.) He also maintains that the civil Complaint did not fairly convey notice "of anything of substance in the context of this case," because the civil Complaint itself was "*effectively* amended by the *sworn* Declaration of BCBST's medical expert," whose "sole 'issue' with the TOI injections that the defendants administered and billed BCBST for was that they didn't contain corticosteroids," but that was not the theory of prosecution pursued in this case. (*Id.* at 18 (emphasis in original).) Given that distinction, according to the defendant, "the benefit of hindsight has only made it clearer that the probative value [of the exhibit] was *substantially outweighed* by the dangers of unfair prejudice, confusing the issues, and misleading the jury within the meaning of Rule 403." (*Id.* at 18.)

As an initial matter, the court rejects the defendant's contention that the civil Complaint did not provide proper notice of "anything of substance in the context of this case." The defense conceded at trial that the civil Complaint was "the absolute mirror image of the allegations" in this case. (Doc. No. 442 at 219.) His contention now that the civil Complaint did not actually provide notice that BCBST believed that the same behavior that forms the basis of the government's allegations in this lawsuit was problematic because it was somehow "amended" by a declaration is unpersuasive. The civil Complaint was clearly relevant to prove Kestner's knowledge and intent in this case.

Further, to the extent that the lawsuit was potentially unfairly prejudicial by virtue of the very similarity between the allegations there and in the criminal case, the court effectively mitigated that potential prejudice by repeatedly instructing the jury that it could consider the civil Complaint for the limited purpose of notice only (notice that BCBST believed Kestner was doing something wrong), not allowing the government to display the document during its closing argument, declining to send the document back to the jury during deliberations, and again reminding the jury during the instructions provided just before they began deliberations that the evidence was to be considered for a limited purpose only. "A jury is presumed to follow its instructions." *Hawkins v. Nagy*, No. 24-1285, 2024 WL 4482122, at *4 (6th Cir. Aug. 19, 2024) (quoting *Weeks v. Angelone*, 528 U.S. 225, 234 (2000)); *United States v. Harvey*, 653 F.3d 388, 396 (6th Cir. 2011). The defendant offers nothing to rebut that presumption. Moreover, the fact that the jury requested a clarification as to the court's first oral instruction regarding the purpose for which they could consider the civil Complaint—while suggesting some initial confusion— strongly indicates that the jury took its responsibility and the court's instructions seriously.

The defendant objected to the introduction of the civil Complaint under Rule 403, which provides that a court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, [or] misleading the jury." District courts are granted "broad discretion" in conducting the "403 balancing." *United States v. Poulsen*, 655 F.3d 492, 509 (6th Cir. 2011). In determining whether the evidence should have been excluded, the court "look[s] at the evidence in the light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *Id.* (quoting *United States v. Bonds*, 12 F.3d 540, 567 (6th Cir. 1993)). To establish that the evidence should be excluded, the defendant must show that "the evidence would 'tend[] to suggest

[a] decision on an improper basis." *Id.* (quoting *United States v. Newsom*, 452 F.3d 593, 603 (6th Cir. 2006)) (alterations in original).

Under that standard, given the difficulty in establishing *mens rea* in a case like this one, the civil Complaint had significant probative value. That value was not substantially outweighed by the danger of unfair prejudice in this case, particularly given the care the court took to instruct the jury on the use it was permitted to make of the civil Complaint and the decision not to send the document itself back to the jury during its deliberations. Moreover, if it was error to admit the civil Complaint into evidence in the first place, as the defendant argues, the next question is whether "it is more probable than not that the error materially affected the verdict." *United States v. Rios*, 830 F.3d 403, 423 (6th Cir. 2016). Again, given the repeated jury instructions—which the jury is presumed to have followed—and the fact that this is not a case in which the government's other evidence was so weak that the civil Complaint was likely to have "pushed the jury over the line," the court finds that any purported error was harmless.

Kestner is not entitled to a new trial based on the introduction of the civil Complaint into evidence.

### 4. The Cumulative Effect of Harmless Errors

Kestner also argues that, even if each of the alleged errors discussed above does not individually constitute reversible error under Rule 33, the cumulative effect of such errors was "overwhelming," particularly given that the evidence of his criminal intent was "so underwhelming." (Doc. No. 453 at 20.)

"The cumulative effect of errors that are harmless by themselves can be so prejudicial as to warrant a new trial. In order to obtain a new trial based upon cumulative error, defendants must show that the combined effect of individually harmless errors was so prejudicial as to render their

trial fundamentally unfair." *United States v. Collins*, 799 F.3d 554, 599 (6th Cir. 2015) (quoting *United States v. Adams*, 722 F.3d 788, 832 (6th Cir. 2013)).

The court finds that there are no errors to accumulate here. Moreover, even assuming that the omission of the words "he knew" from the "deliberate indifference" instruction qualifies as a plain error and that the introduction of the BCBST civil Complaint qualifies as harmless error, the combined effect of these two errors, in light of the evidence in the record establishing Kestner's guilt, did not render the trial fundamentally unfair.

> 5. *The Verdict Was Not Against the Manifest Weight of the Evidence*

Finally, under Rule 33, the court may order a new trial "if the evidence weighs 'heavily against the verdict.'" *United States v. Burks*, 974 F.3d 622, 625 (6th Cir. 2020) (quoting *United States v. Bowens*, 938 F.3d 790, 796 (6th Cir. 2019)). In ruling on a Rule 33 motion, the court must both "scrutinize the record and ensure that a 'miscarriage of justice' did not occur" and, at the same time, "respect the role of the jury and ensure that evidence-supported convictions are upheld." *Id.* (quoting *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998)). Given this standard, the court should order a new trial "[o]nly in 'extraordinary circumstances,'" when the verdict "exceeds the bounds of reasonableness." *Id.* (quoting *United States v. Hughes*, 505 F.3d 578, 592–93 (6th Cir. 2007)). "The verdict [is not] unreasonable simply because different inferences could have been drawn or because other results are more reasonable." *Id.* (quoting *United States v. Lyimo*, 574 F. App'x 667, 672 (6th Cir. 2014)).

The court, viewing the evidence in its totality, finds in its role as "thirteenth juror" that the government put forth more than sufficient evidence to establish beyond a reasonable doubt that Kestner knew that his providers were performing medically unnecessary TOI injections, that he nonetheless continued to pressure and incentivize the providers to administer and bill the government healthcare programs for medically unnecessary TOI injections, that he conspired with

his co-defendants and others, and that he had the requisite intent to defraud the government. The verdict did not exceed the bounds of reasonableness.

## IV.  CONCLUSION

As set forth herein, the court will deny the defendant's Motion for Judgments of Acquittal (Doc. No. 452) and his Motion for a New Trial (Doc. No. 453). An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge